## Adams v. Adams' Adm'r et al.

(Decided Feb. 4, 1938.)

356

W. H. SOUTHALL and WHITE & CLARK for appellant.

H. W. LINTON and S. T. FRUIT for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Seeking to have construed certain provisions of the will of John W. Adams, who died in June, 1931, the administrator with the will annexed filed a petition in equity, in which controversial portions were set out. In so far as the question presented is concerned, the contesting parties are appellant, widow of testator, and guardian of her infant daughter; appellees are William and Benoni Adams, sons of testator by a prior marriage.

In the lower court a judgment was rendered for the two sons, from which the widow for herself, and as guardian, appeals.

Testator during his lifetime had been a successful farmer, accumulating a respectable estate. He was married twice, first to a Miss Shouse; to this union two sons (appellees) were born. Both were under age at the time of testator's death, but were matured at the time of this suit. The daughter, at the time of the execution of the will was fourteen months old. Such parts of the will as bring about the controversy are quoted:

"I, John W. Adams, of Church Hill, Christian County, Kentucky, being of sound mind and disposing memory, and mindful of the uncertainty of life, and the certainty of death, do make, publish and declare this to be my last will and testament, hereby revoking all former wills made by me.

"First: It is my will that all my just debts, if there be any owing at the time of my death, be

first paid out of my estate. I include herein my burial expenses.

"Second: I have been married twice, my first wife having died several years ago, leaving two children born to her and myself, named William and Benoni, aged, respectively, fifteen and thirteen, and it is my will that they shall receive each the sum of Twenty-five Hundred ($2,500.00) Dollars, or Five Thousand ($5,000.00) Dollars, for the two, out of funds that belonged to their mother and which I have been holding and taking care of for them, and I consider it just and equitable that they should have same, on account of its having been recognized as the property, or money, of their said mother, and it was so intended by her and myself.

"I wish the parties hereinafter named to act as trustee for said children at my death.

"It is further my will that the said trustees take care of, and keep the said fund well and safely invested at as large a rate of interest as they can secure, until they reach the age of twenty-five years, the share of each to be paid when he becomes twenty-five years old. The interest on said fund to be used for the benefit of said children for their education, and necessary support until they attain their majority, and as each becomes twenty-one years of age his portion of the interest on said fund to be paid to him directly.

"Third: I will and devise all of my estate, real, personal and mixed, and not heretofore devised by clause two, to my wife, Talmage C. Adams, and my three children, William, Benoni, and Anne Cook Adams, to be equally divided between them, each to receive his or her portion absolutely, subject to the provisions hereinafter made in regard to the disposition of it."

Testator was first married in 1911, the wife dying in 1923. The father of the then Mrs. Adams died prior to 1919, leaving a fair estate, upon settlement of which Mrs. Adams received $4,322.26 as her part of the personal property. This consisted of cash, $2,087.26, five Saving Certificates of $420, and two notes amounting to $1,815. Her brother purchased her undivided interest in the father's real estate, paying her $2,000 in the

spring of 1919, and $1,000 in January or February, 1920, thus making the total Mrs. Adams received from the estate $7,322.26.

Mrs. Adams died some time in 1923, and testator qualified as administrator of her estate. On May 23, 1924, appraisers returned appraisal of the personal estate, showing cash in bank, $117; two notes aggregating $2,000; two Liberty bonds, with coupons attached, $1,000; and an interest in a trust contract of $2,000—a total of $5,117.10. No settlement of the wife's estate was made until March 17, 1926, at which time the administrator charged himself with the amount of the appraisement, and the sum of $708.79, made up of interest on bonds, interest on investment, and income on trust contract, showing a total of $5,825.89. After allowing for necessary court costs and expenses there remained for distribution $5,529.65, and Mr. Adams gave his personal receipt for $2,764.82, and one as guardian of the two boys for a like amount, closing his administrative account. This settlement was approved November 17, 1926. No report as guardian was made until May 20, 1930, on which day he made a report to the proper court showing, "Deposits to the amount of inventory filed March 17, 1926, $2,764.83." This inventory showed the receipt of two real estate bonds with accrued interest, $2,015; one Liberty bond with accrued interest, $507.00; cash $242.83. Mr. Adams never made final settlement as guardian. He did not keep his account as guardian and administrator separate from his own account.

The appellees, by themselves (and guardians) in pleading, assert that while the guardian did not keep segregated the "actual money," representing their part of the mother's estate, he did intend to and did charge them with such funds as he had received as their guardian, the fund thus held being their money, therefore not subject to be willed by their father. They say that testator received more than $7,000 from his wife's estate, and it was his intention, under the terms of his will, to bequeath to them "all that he had received from her estate, and that the sum ($5,000) so devised (less the trust fund), about equals the amount received by him from that estate." Therefore, they are entitled to $2,500, because it was their property, and in addition $5,000 as being approximately the amount *received* by testator from his wife's estate.

Appellant alleged that the inventory of Mrs. Adams' personal property totaled $5,117, which represented her entire personal estate; that Mr. Adams, as representative, filed his settlement showing the receipt of said amount, plus accumulated income, which he distributed in the manner above set out. They say that he did not keep separate these funds, but kept them in his own name individually, and thus used and invested them, so that upon his death all funds coming to his hands, including such as belonged to the infants, were in his individual name and account; that at the time and since the execution of his will, he had been using and controlling the personal estate of the first wife coming into his hands (including the portion belonging to the children) as his own, without separation thereof, and that this aggregate sum ($5,229.65) represented such entire estate. They contend it was testator's desire that appellees should have such sum, being that portion of the wife's estate which had come into his hands under the settlement above mentioned. It is alleged (and it is true) that the will designated no other funds out of which the $5,000 should be paid.

Reply admitted that the appraisement and settlement showed a net amount of $5,117.10, but denied that it represents the *"entire estate of Mrs. Vyra Adams."* They allege, as is shown by proof, that she received $3,000, proceeds of the sale of her interest in her father's estate, hence *she received* from her father's estate a total of $7,322.26, and it was the intention of the testator, as reflected in the will, that they have the entire amount. Unanswered pleadings were controverted by agreement.

Upon submission the court held:

"In considering and construing the language and provisions of the will, * * * by the second clause * * * testator meant to bequeath and did bequeath and give to his two sons * * * each the sum of $2,500, without taking into account, or deducting therefrom, any sum or sums then being held by the guardian of each of said sons, * * * the plaintiff is authorized to pay to the respective trustees of each of said two sons the sum of $2,500.00 in compliance with the bequest contained in the said clause of the will."

From this portion of the judgment the widow for herself and ward prayed and was granted an appeal.

Evidence, beyond such manifested by authenticated copies of inventories and settlements, consisted of the testimony of the brother of the first wife, who settled his father's estate, a brother of deceased, and an officer of a bank with which both Mr. and Mrs. Adams carried accounts.

The first named testified, as above recited, concerning the amount he had paid to his sister from the personal estate of her father, and the $3,000 for her portion of the real estate. The second, testator's brother, was of the opinion that testator had received and used for his benefit all the proceeds coming to Mrs. Adams from her father's estate. This conclusion arose, as he stated, from the fact that some time prior to 1926, Mr. Adams carried what developed to be a bad loan of $10,000 on the West farm. In 1928 this farm was deeded to Mr. Adams in satisfaction of this debt. Witness testified as follows:

"Q. Do you know whether that money that he furnished on this loan was his own individual money, or whether part of it belonged to somebody else? A. Part of it was his wife's money. His first wife, Vyra E. Adams.

"Q. Do you know whether Mrs. Adams, at the time Mr. Adams took the deed to this property, do you know whether he paid her back the money *she* had invested in it, or paid it back to her estate? A. No, sir, he had not. He still had it in this investment."

The witness makes it appear that the amount of personal estate received by Mrs. Adams from her father's estate was not properly reflected in the settlement, since he insists that she received more, not including the proceeds from the sale of her interest in the real estate. He is able, however, to suggest only $500, which later he says she invested in an automobile.

Up to the time of Mr. Adams' death he had done his banking business with the First National, which was afterward consolidated with the City Bank & Trust Company, when is not shown, though the latter bank held the records of the former. The sum and substance

of the banker's testimony is (appearing from a ledger sheet) that Mr. Adams placed to his credit, as administrator of Mrs. Adams, small sums, beginning with May 24, 1923, $38.36, September 25, 1923, $2,066.33, and other deposits of $57 or less, the total not being given. He said, speaking from the account of Mrs. Adams, that on February 25, 1919, she deposited $2,087.26. Being asked what checks showed against her account from that time up until May, 1923, he answered.

"Possibly two thousand dollars * * * in sizes from $5.00 to $94.00. Here are two two thousand dollar checks, $1,006.00, two other large checks, one for $1,000, and one for $1,510.00. * * * The deposits were all small until December 1922, there is $2,047.50 deposited, and $500.00 on January 3, 1923."

The difficulty in any sort of analysis of the above figures is due to the fact that the "sheets" from which witness was testifying, and which were considered in the evidence, are absent from the record.

This testimony does not show the source of her deposits, nor to whom her many checks were payable. The amount received from her father's personal estate is traceable, as are the two payments by her brother for her interest in the real estate. It also appears that on December 8, 1922, she deposited $2,047.50, and on January 3, 1923, $500, both sums after the settlement of her father's estate, and the payment to her for her real estate interest. Taken as it is here presented, the testimony gives us very little assistance. It does show Mrs. Adams had engaged in various transactions.

Appellant states the question to be determined by us is: Did the testator intend to devise to his sons $5,000 over and above the funds which he held as their guardian, thus exceeding all sums which had come into his hands from his wife, either for himself or them? Or did he intend (when the whole will is considered) to include only such funds as had actually been held by him (his portion and that of the sons, including the latter), so as to render it unnecessary after his death to account for the guardianship funds? Or did he also attempt to have the latter fund controlled so as that it would remain in trust until the sons should reach the ages of twenty-five?

Appellee states the question after this manner:

"Did John W. Adams intend by the second clause of his will to give to the sons the money he held as their guardian, or did he intend to give them the money their mother received from her father and her father's estate?"

There is little doubt but the testator intended by clause 2 to devise the fund he held as guardian, or at least circumscribe it so as they might not receive it until they had reached the age limit fixed in the will. But we can see nothing in the will which would indicate that the sons were to receive, under the will, all the money *received* by their mother from her father's estate. The language indicating that the devise to the sons should be *"out* of funds that belonged to their mother, and which I have been holding for them,"* would preclude the idea that he intended, as argued by appellee. Such intention might very easily have been formed into expression, if such had existed in testator's mind.

In approaching the matter of construing the parts of the will in controversy, we do so with the assumption that Mr. Adams was a man of honesty and integrity. Such is a fair inference, since nothing is shown to the contrary. In fact, honesty of purpose is reflected not only by clause 2, but by the entire document. A reading of the will would lead one to believe that he was painstaking and careful; that it was his desire to be extremely fair; not endeavoring to favor one class over the other, save in respect to such part of his first wife's estate, as "I have been holding and taking care of" for the two sons, as was intended by testator and his wife. It would be rash to presume that testator had actually received from his wife's estate $7,500, and in settlement accounted for less. The facts adduced do not authorize such a conclusion; the testimony of the brother is far from such as would lead to the conclusion that testator had invested a part of his wife's estate in the West farm, later taking a deed to himself, and then failing to account in settlement of her estate, or as guardian.

It may be pointed out as having some bearing, that in the appraisement of the estate of Mrs. Adams, there appeared an item "trust contract," held in the name of Mr. Adams; her part was appraised at $2,000; in a

measure this would represent a part of the funds which testator had "been holding and taking care of for them," and conceived by him to belong to her. The remainder of the $5,117, according to the appraisement, was in securities, which Mrs. Adams had ostensibly taken (or her husband for her) in her own name, among which were notes and Liberty bonds. This would justify a conclusion that when testator said, "Five Thousand Dollars, for the two *out of the funds* that belonged to their mother, and which I have been holding and taking care of for them," he identified the trust fund and such personal estate as he had accounted for in his settlement.

The bank records show that Mr. Adams had a "one-sheet" guardian's account, which did not begin until July, 1926, and which was closed October 9, 1931. This shows no transactions, except a deposit of $2,057 (no date) and smaller deposits of income or interest collections. It is apparent that after his wife's death, and up to settlement in 1926, he kept no account of these, or guardianship funds, but treated and handled both as his own, or at least as having the right to their use up to the date of his guardian's report, near the time of making his will. Thus it is not difficult to conclude that when he spoke of his holding of funds which belonged to their mother, he had reference to the portion going to the sons, and that portion which he had set aside to himself in the settlement. It is noted that when pressed for a settlement of the guardian account, he said to some one, "I have fixed that in the will," and nothing further than the report mentioned above was ever made by testator.

In clause 1 of the will the testator, as is not unusual, provided for the payment of his just debts, but added, "If there be any owing at the time of my death." This seems to be expressive of the belief that there ought not to be owing any debts at the time of his death. It is difficult to conceive that if he had used his wife's money in the West investment, or had borrowed it from her, he would not have recognized such as a debt against his estate. The will was written after he had qualified as representative of his wife's estate, made settlement, and qualified as the guardian of the two boys. What is said in regard to the claim of indebtedness to his wife or her estate would be applicable to

the trust fund,'that is, he did not at the time of the execution of the will consider himself as being indebted (in the true sense of the term) to them. We need not discuss the question as to whether the testator had the power to postpone payment of the trust fund, as no doubt was attempted, to a date after the boys had arrived at maturity. The court below did not determine this question, and it is not before us. What we have said as to this effort and purpose is only in endeavoring to ascertain the intention of testator as gathered from the entire will.

This much may be said: The testator did provide that the "said fund" should be held and managed by the trustees until each boy should attain the age of twenty-five. By this provision he undertook to place them in a position to renounce the provisions of the will or, with the others, take under his will, on its terms. The West farm is still a part of testator's estate, as we see from the record.

After a careful survey of the will in question, and a like reading of the proof, we conclude that the chancellor was in error in adjudging that the administrator should pay the two sons of Mr. Adams $5,000, without regard to the sum held by the father as guardian. He should have adjudged that taking into consideration the amount of the trust fund, the total to be paid to them, their trustees or guardians, should be $5,000. The testator manifested no intention to give them more.

Judgment reversed, and cause remanded with directions to set aside the judgment appealed from, and enter one in conformity herewith.